## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

1:18-CV-80633-ROSENBERG/REINHART

MARGARET SCHULTZ,

      Plaintiff, on Behalf of a Putative Class,

vs.                                                  CLASS ACTION

AMERICAN AIRLINES, INC.
a foreign for-profit corporation,

      Defendant.

_____/

## THIRD AMENDED COMPLAINT

Plaintiff, Margaret Schultz, individually and on behalf of a putative class of similarly situated individuals, sues Defendant, American Airlines, Inc., and states:

### I. PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff is a citizen of Florida who resides in Palm Beach County.

2.      America Airlines, Inc. ("American") is a corporation organized and existing under the laws of Delaware.

3.      American's headquarters and principal place of business are in Fort Worth, Texas.

4.      The putative class (referred to herein collectively as the "putative Class" or the "Class," and individually as a "Class Member" or the "Class Members") consists of citizens of the various United States, including residents of Florida and Palm Beach County. As to all utterances herein, the Class includes Plaintiff.

**MASON KERNS LAW** PA

1814 Southwest 22nd Avenue | Suite 6 | Miami, Florida 33145
**P** 305.725.8300 | www.MasonKerns.com | **F** 305.422.0400

5.      This Court has original jurisdiction pursuant to the Class Action Fairness Act of 2005, codified at 28 U.S.C. §§ 1332(d), 1453, and 1711-1715, because:

  a.  The Class Members eligible to participate in this action are those who:

      i.  Meet the Class definition in Paragraph 87, *infra*; and

      ii. Experienced the described event in the five years preceding:

          1.  The filing of this Third Amended Complaint; or

          2.  In the alternative and upon a finding of relation back of the pleading, the filing of the original Complaint, on April 11, 2018,

      as these Class Members' claims are timely pursuant to Florida's five-year limitation-of-action provision, Fla. Stat. § 95.11(2)(b) (2017), applicable to breach-of-contract actions;

  b.  During the latest five-calendar-year period on record, 2014 through 2018, according to the Bureau of Transportation Statistics of the United States Department of Transportation, approximately 668,570,000 passengers were booked and scheduled to leave from a United States airport on an American Airlines flight[1];

---

[1] *See* BUREAU OF TRANSPORTATION STATISTICS, UNITED STATES DEPARTMENT OF TRANSPORTATION, Airlines Ranked by U.S.-Based Scheduled Domestic and International Enplanements, 2014 (87.785 million passengers), 2015 (146.5 million passengers), 2016 (144.2 million passengers), and 2017 (144.9 million passengers), retrieved February 12, 2018 at, respectively, https://www.bts.gov/newsroom/summary-2014-us-based-airline-traffic-data, https://www.bts.gov/content/table-3-airlines-ranked-2016-us-based-scheduled-domestic-and-international-enplanements, https://www.bts.gov/content/table-3-airlines-ranked-us-based-2017-scheduled-domestic-and-international-enplanements, and https://www.bts.gov/content/table-3-airlines-ranked-us-based-2017-scheduled-domestic-and-international-enplanements. As 2018 statistics are not yet completed, the 145,185,000 estimated 2018 passengers (which brings the five-year, 2014-2018 total to 668,570,000) is an average of the previous three years' (2015-2017) numbers. The 2014 figure was not used to estimate the 2018 passengers because American acquired U.S. Airways in 2015, which dramatically increased American's passenger count from 2015 forward.

www.MasonKerns.com | MASON KERNS LAW | AAClassAction@MasonKernsLaw.com

c.  As, in the United States, 83 percent of travel is booked online as of 2017,[2] it can be deduced that roughly 534,856,000 (80 percent) of the 668,570,000 aforementioned tickets were booked on aa.com during the five years preceding the applicable filing date, during which the aa.com booking screens appeared substantially similar to that encountered by Margaret Schultz as pleaded herein;

d.  As approximately 14.5 percent[3] (77,675,284) of the 534,856,000 tickets were for international flights, and as it stands to reason that approximately half (38,837,642) of those 77,675,284 tickets were return flights for foreign passenger visiting the United States, approximately 500,000,000 of the 534,856,000 tickets were for United States residents (U.S. residency is required for membership in the defined Class; *see* ¶ 87, *infra*);

e.  Based on the fact that Plaintiff herself was victimized by the offending conduct no less than three times in five months; on user experiences as stated on Internet message boards and other online consumer forums; and on experiences and informal experiments conducted on aa.com by the firm of the undersigned attorney and by the prior law firm representing Plaintiff, Plaintiff estimates that

---

[2] 29 Mar 2018, "5 Digital Trends to Watch in Hospitality Marketing," SOCIAL MEDIA TODAY (utilizing 2018 study authored by MDG Advertising), retrieved February 12, 2018 at https://www.socialmediatoday.com/news/5-digital-trends-to-watch-in-hospitality-marketing-infographic/520225/.

[3] In 2017, for example, 107.7 million of the 741.6 million—14.5 percent—of U.S.-originating flights were international, as opposed to wholly domestic. BUREAU OF TRANSPORTATION STATISTICS, UNITED STATES DEPARTMENT OF TRANSPORTATION, Annual Enplanements on U.S. Carriers and on Foreign Carriers' U.S. Flights 2016-2017, retrieved February 12, 2018 at https://www.bts.gov/content/table-1a-annual-enplanements-us-carriers-and-foreign-carriers-us-flights-2016-2017.

www.**MasonKerns**.com | MASON KERNS LAW | AAClassAction@MasonKernsLaw.com

at least 1,000,000—at least 1 out of every 500 (.002) of the 500,000,000—tickets referred to in the preceding paragraph were more costly, alternative tickets obtained for United States residents after the ticket's buyer accepted an American Airlines, Inc. offer to buy cheaper airfare on aa.com after having navigated substantially the same airline website screens and content as Margaret Schultz, clicking the "Pay now" button after entering valid payment information, and being informed by the airline that it was refusing to honor the cheaper fare;

f.  While Plaintiff incurred approximately $123 in damages, each of the approximately **1,000,000 Class Members** incurred, as estimated from the sources in the preceding paragraph, between approximately $30 and $150 in damages, with most losses falling in the lower range, for an average of approximately $50 in damages per passenger;

g.  The Class aggregate damages as pleaded thus total approximately **$50,000,000**—1,000,000 persons times $50 per person.

h.  Plaintiff, and approximately 6.4 percent (64,000) of the approximately 1,000,000 Class Members, are citizens of Florida;[4]

i.  American is a citizen of Delaware and Texas, being incorporated in the former and maintaining its headquarters and principal place of business in the latter; and

---

[4] *See* Annual Estimates of the Resident Population: July 1, 2017, BUREAU OF THE CENSUS, UNITED STATES DEPARTMENT OF COMMERCE, accessed February 12, 2019 at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=PEP_2017_PEPANNRES&src=pt. (providing that as of July 1, 2017, an estimated 20,984,400—6.4 percent—of the estimated 325,719,178 United States residents live in Florida).

4

     j.   None of the exceptions to federal class-action jurisdiction appearing in 28 U.S.C. § 1331(d)(3)-(11) are applicable.

6.     At all material times, American subjected itself to the jurisdiction of the Courts of Florida via the state's long-arm jurisdiction provision, Fla. Stat. § 48.193, by:

     a.   Maintaining regularly functioning business offices in Florida;

     b.   Operating, conducting, engaging in, and carrying on its business—including the marketing and selling of commercial airline tickets and operation of commercial flights—in Florida, both in various airports and other establishments throughout the state, and by reaching into Florida via the Internet;

     c.   While reaching into Florida from other states via the Internet as part of its regular business practices, committing the wrongful acts and omissions alleged herein against various Class Members, who at the time of such acts and omissions were, as American knew, in Florida;

     d.   Causing injury by breaching contracts while the breaching American agents were physically outside of Florida but:

        i.   While American was engaged in solicitation and service activities in Florida; and

        ii.   While American's services were sold, used, and consumed within Florida in the ordinary course of trade and commerce;

     e.   Consummating and breaching contracts with Plaintiff and other Class Members at times when American knew that such Class Members were in Florida and would suffer harm from American's actions herein;

www.MasonKerns.com | MASON KERNS LAW | AAClassAction@MasonKernsLaw.com

     f.   Through its continuous and systematic business practices, establishing Florida's general jurisdiction over American such that it could at any time reasonably be haled into court herein for acts and omissions occurring in Florida and elsewhere; and

     g.   Operating so regularly and establishing contacts so pervasive in Florida that the state courts' jurisdiction over American is consistent with due process and traditional notions of fair play and substantial justice.

7.    As Plaintiff accessed her computer in Palm Beach County, American intentionally reached into the county via the Internet and induced Plaintiff to enter into the contract at issue through direct marketing to a consumer it knew, on account of America's sophisticated information technology system, was located in the county.

8.    Knowing Plaintiff was at the time located in Palm Beach County, American entered into (and breached) the contract at issue in the county[5], knowingly causing harm to Plaintiff in Palm Beach County and effecting accrual of Plaintiff's action, as defined by Fla. Stat. § 47.011, in the county.

9.    Palm Beach County is home to more than 1.3 million people, has the fifth-highest per-capita income of all Florida counties, is a center for tourism and seasonal living, and contains an international airport and numerous corporate headquarters. These factors correlate with disproportionately frequent air travel to and from the county, and thus the citizens of Palm Beach County are, relative to the average county in the United States,

---

[5] "[A] contract is made at the place where the last act necessary to complete the contract is done." *Jemco, Inc. v. UPS*, 400 So. 2d 499, 500 (Fla. 3d DCA 1981); *See also Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1092-93 (11th Cir. 2004) ("The determination of where a contract was executed is fact-intensive, and requires a determination of where the last act necessary to complete the contract was done.") (internal citation omitted).

www.MasonKerns.com | MASON KERNS LAW | AAClassAction@MasonKernsLaw.com

disproportionately likely to fall victim to the contractual breaches by American that are described herein. As such, Palm Beach County is an ideal forum.

10. Based on the foregoing, jurisdiction lies, and venue is proper and convenient, in this Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida.

11. American removed Plaintiff's state court action, pursuant to 28 U.S.C. § 1444 *et seq.*, on May 14, 2018, vesting jurisdiction in this Court.

## II. FACTUAL ALLEGATIONS

12. Plaintiff incorporates by reference Paragraphs 1 through 11 as though fully set forth herein.

13. By every meaningful measure—fleet size, flights offered, passengers flown—American is the largest airline in the world.

14. The majority of American flights are purchased through its website, aa.com.

15. To maximize profitability, American hires computer engineers to manipulate flight prices by tracking consumer behavior on its website and changing prices on consumers whom American learns will pay a higher price based on their browsing histories and other characteristics.

16. American has ascertained, through millions of observations of millions of flight bookings on its website, and other forms of data mining, that once consumers decide on an airline, departure airport, arrival airport, flight time, and price level for a specific seat, they will likely pay a higher price for the same seat to avoid the hassle and stress associated with changing their flight.

17. As explained below, Plaintiff and the putative Class navigated through five aa.com screens before arriving at the sixth, titled "Review and pay."

18.     Upon arriving at Screen 6, Plaintiff and each Class Member had been offered a contract—airfare for money, essentially—by American.

19.     As elaborated upon below, after Plaintiff and each Class Member completed the last act necessary to accept American's contract offer by clicking "Pay now" on Screen 6, American breached its contract with each Class Member by refusing to perform as promised and as it was obligated.

**PLAINTIFF NAVIGATES AA.COM TO PURCHASE AIRFARE**

*Screen 1: Departure and Destination*

20.     In furtherance of purchasing airfare for her nephew, Plaintiff, on May 25, 2017, directed her Internet browser to aa.com, wherein she encountered a screen substantively identical[6] to that in the image directly below, which Plaintiff incorporates by reference into this                                                                                      paragraph.

---

[6] As used throughout this complaint, "substantively identical" means the text on the screen and the location of text-entry boxes, links, and other items on the screen are either (1) exactly identical, or (2) nearly identical—e.g., a text link encountered by Plaintiff on May 25, 2017 has the same text as, but is a slightly darker blue color than, a text link that appears herein—with any differences being *de minimis* and of no significance, by any objective standard, as to any issue raised in the complaint.

Items such as background graphics—e.g., the image in Screen 1 of a man peering from a rocky coastline out over the Mediterranean Sea—may have been slightly different for Plaintiff than appears herein, but said differences are of no consequence as to any issue raised in the complaint. Items such as advertisements, and other images and text of no consequence as to any issue raised in the complaint, are in some instances cropped out of the screen shots utilized in the complaint. Such omitted screen items are noted in bracketed text in boxes that approximate the position of the omitted item on the given screen. Additionally, in the interests of economy, the text that appeared in the shaded area at the bottom of every screen of aa.com encountered by Plaintiff on May 25, 2017—hereinafter, the "Footer"—is removed herein from every screen, and reproduced and explained one time below.

With the exceptions noted in this footnote and as otherwise set forth herein, the screens and exhibits reproduced herein are substantively identical to those viewed by Plaintiff on May 25, 2017.

www.**MasonKerns**.com | **Mason Kerns Law** | AAClassAction@MasonKernsLaw.com



[ADVERTISEMENT / COLOMBIA AND VENEZUELA BAG POLICY LINK]⁷

Hereinafter, this screen may be referred to as "**Screen 1: Departure and Destination**," or as

"Screen 1."

---

⁷ As its name suggests, the "Colombia and Venezuela bag policy" link, excluded from this page, does not contain any bag policies applicable to Plaintiff's flight.

21.     The image of Screen 1 contains two links: "Bag and optional fees" and "Advanced search."

22.     "Advanced search" affords the aa.com customer more flight-search options. Plaintiff did not click the "Advanced search" link.

23.     The "Bag and optional fees" link on Screen 1 would, if clicked, have brought Plaintiff to a screen, titled "Optional service fees," that is substantively identical to that attached hereto as **EXHIBIT 1**. Plaintiff does not know whether she clicked on the "Bag and optional fees" link and viewed Exhibit 1, but seeing or not seeing the screen would not have affected whether she later possessed an objectively reasonable basis to believe she was accepting a contract offer upon clicking "Pay now" on Screen 6. [8] *See infra.*

24.     On Screen 1, Plaintiff did not log in. She clicked the "Book flights" tab; clicked the "One way" sub-tab; entered "DCA" (the airport code for Ronald Reagan Washington National Airport) in the "From" box; entered "MIA" (the airport code for Miami

---

[8] To clarify confusion emanating from Plaintiff's first complaint, and as explained more thoroughly herein, Plaintiff's allegation is that a contract had been offered to her **at the point in time at which she reached Screen 6**, as Screen 6 is defined in this complaint. That offer was pending until, and Plaintiff accepted the offer at the time, she clicked "Pay now" on Screen 6. American could have revoked that offer up until the exact point in time at which Plaintiff clicked "Pay now." Upon Plaintiff clicking "Pay now," American lost its right to revoke its offer. Contract-law axioms support no other conclusion. "If an offer is accepted without conditions, and without varying its terms, and the acceptance is communicated to the other party without unreasonable delay, a contract arises, from which neither party can withdraw at its pleasure." *Am. Appraisal Associates, Inc. v. Am. Appraisals, Inc.*, 531 F. Supp. 2d 1353, 1358 (S.D. Fla. 2008) (citing RESTATEMENT OF CONTRACTS § 64); RESTATEMENT (SECOND) OF CONTRACTS § 63 ("Unless the offer provides otherwise, an acceptance made in a manner and by a medium invited by an offer is operative and completes the manifestation of mutual assent as soon as put out of the offeree's possession, without regard to whether it ever reaches the offeror."); *Jackson v. Inv. Corp. of Palm Beach*, 585 So. 2d 949, 950 (Fla. 4th DCA 1991) ("…offer is a mere proposal or conditional promise which, if **accepted before it is revoked**, creates a **binding contract**.") (emphasis added). *Cantu v. Cent. Educ. Agency*, 884 S.W.2d 565, 567 (Tex. App. 1994) ("…an acceptance by any medium reasonable under the circumstances is effective on dispatch, absent a contrary indication in the offer.") (citing RESTATEMENT (SECOND) OF CONTRACTS §§ 30(2); 63(a); 65 ("Unless circumstances known to the offeree indicate otherwise, a medium of acceptance is reasonable if it is the one used by the offeror or one customary in similar transactions at the time and place the offer is received."); 66.). American cannot reasonably argue that its website, the medium utilized by Plaintiff to accept American's offer, is not a medium "used by the offeror or one customary in similar transactions…" *Id.*

www.MasonKerns.com | MASON KERNS LAW | AAClassAction@MasonKernsLaw.com

International Airport) in the "To" box; and selected "5/26/17" in the "Depart" date box. Plaintiff then clicked the "Search" button.

*Screen 2: Choose flights*

25.     Clicking the "Search" button on Screen 1 button brought Plaintiff to a screen substantively identical to that in the image directly below—which image Plaintiff incorporates by reference into this paragraph—except that the flights were for May 26, 2017 rather than October 26, 2018; the flight times and prices were different and there were more flights listed than appear below; and the "Basic Economy" column was not present.[9]

---

[9] At least as concerns flights from DCA to MIA, the "Basic Economy" class concept was instituted by American on a date after May 26, 2017.

www.MasonKerns.com | MASON KERNS LAW | AAClassAction@MasonKernsLaw.com



Hereinafter, this screen may be referred to as "**Screen 2: Choose flights**," or as "Screen 2."

      26.      Had Plaintiff clicked the "Product comparison" link on Screen 2, such would

have caused a window, also titled "Product comparison," to pop up on the screen, which

window would have been substantively identical to that attached hereto as **EXHIBIT 2**, except that the **highlighted portions that appear in Exhibit 2 would not have appeared in the pop-up window viewed by Plaintiff**.[10] Plaintiff does not know whether she clicked on the "Product comparison" link and viewed Exhibit 2, but seeing or not seeing this pop-up window would not have affected whether she later possessed an objectively reasonable basis to believe she was accepting a contract offer upon clicking "Pay now" on Screen 6.

27.     Plaintiff does not know whether, while she was on Screen 2, she clicked the "Details" link associated with the flight referenced in Paragraph 29, *infra.* That click would have caused a window to pop up on the screen that indicated the flight time, flight number, aircraft type, and travel time associated with that flight—all of which Plaintiff also viewed on later screens before she clicked "Pay now" on Screen 6. Thus, clicking the "Details" link was of no importance to the ultimate issue here; it would merely have provided Plaintiff flight details sooner than if she had not clicked the link.

28.     Plaintiff doubts she clicked on Screen 2 the "Seats" link associated with any flight. This link would, if clicked, merely have caused a window to pop up showing the seating map for a given flight—which Plaintiff later encountered, relative to the flight she actually chose, on "Screen 5: Choose your seat." *See infra.* Accordingly, viewing the pop-up windows associated with the "Seats" link on Screen 2 would not have affected whether she later possessed an objectively reasonable basis to believe she was accepting a contract offer upon clicking "Pay now" on Screen 6

29.     On Screen 2, Plaintiff did click on a box corresponding with a May 26, 2017,

---

[10] Also, because Exhibit 2 is shown in three states of scrolling, some items, both graphics and text, appear more than once in the exhibit. Had Plaintiff viewed this pop-up window on May 26, 2017, all items would have appeared only once.

"Main cabin," "One way" flight from DCA to MIA, with a $197 listed price.

*Screen 3: Your trip summary*

30.     Clicking on that aforementioned box on Screen 2 brought Plaintiff to a screen substantively identical to that in the image directly below—which image Plaintiff incorporates by reference into this paragraph—except that the flight summarized for Plaintiff was on May 26, 2017; was at a different time; listed "$197 per person" rather than "$210 per person"; listed, directly below the "per person" line, a "Total" amount of an exact price between $196.01 and $197.00, inclusive; may have had a different flight number; and may have listed a different model of airplane.



www.MasonKerns.com | Mason Kerns Law | AAClassAction@MasonKernsLaw.com

[ADVERTISEMENT]

| Log in and continue | Continue as guest |

Hereinafter, this screen may be referred to as "**Screen 3: Your trip summary**," or as "Screen 3."

31.    The "Price and tax information" link on Screen 3 would, if clicked, have brought Plaintiff to a screen, titled "Fare, taxes and fees," that was substantively identical to that attached hereto as **EXHIBIT 3**, except that:

a.   The "Adult (*per passenger*)" fare amount would have been roughly $171 on Plaintiff's screen;

b.   The "TRANSPORTATION TAX (UNITED STATES)" amount would have been roughly $11.50 on Plaintiff's screen; and

c.   Regardless of the exact amounts of the fare and transportation prices, in the "Total" row on Plaintiff's screen there would have been an exact amount between $196.01 and $197.00, inclusive, "USD per person."[11]

Plaintiff does not know whether she clicked on the "Price and tax information" link and viewed Exhibit 3, but seeing or not seeing the screen would not have affected whether she later possessed an objectively reasonable basis to believe she was accepting a contract offer upon clicking "Pay now" on Screen 6; nor would what the total exact price between $196.01

---

[11] For ease, Plaintiff refers to the final price as $197 throughout this complaint, but it could have ben as many as 99 cents less than that. The price was a price certain—it was an exact figure, not a range—but Plaintiff will not know, until discovery, which exact price between $196.01 and $197.00 it was.

www.MasonKerns.com | MASON KERNS LAW | AAClassAction@MasonKernsLaw.com

and $197.00, inclusive, was, have affected same.[12]

32.     Plaintiff does not know whether she clicked the Details link, which would have opened the same pop-up window as that explained in Paragraph 27, *supra.* For the reasons stated in that paragraph, whether Plaintiff clicked on that link is completely inconsequential.

33.     Plaintiff clicked the "Continue as guest" button at the bottom of Screen 3.

*Screen 4: Passengers*

34.     Clicking "Continue as guest" on Screen 3 brought Plaintiff to a screen substantively identical to that in the image directly below—which image Plaintiff incorporates by reference into this paragraph—except that the listed flight was for May 26, 2017 rather than October 26, 2018; and the price, rather than $209.21, was an exact figure between $196.01                  and                  $197.00,                  inclusive.



**Passengers**

« New search

**One way** Washington, DC to Miami, FL

Friday, October 26, 2018

Your trip total
**$209.21**

Price for all passengers
Price and tax information

Includes taxes and carrier imposed fees
Bag and optional fees

[ADVERTISEMENT]

---

[12] It makes no difference whether the price was, for example, $196.25 or $196.98. The point is that it was one exact price that was clearly communicated on multiple screens.

www.MasonKerns.com  |  Mason Kerns Law  |  AAClassAction@MasonKernsLaw.com

# Passenger details

Please enter all passenger names as they appear on the passenger's government-issued photo identification. TSA privacy notice

First name •

Middle name

Last name •

Date of birth •

Gender •

Frequent flyer program

Frequent flyer number

Redress number ⓘ

Known Traveler number ⓘ

⊕ Add special assistance

## Trip contact

Primary email •

Confirm primary email •

Primary phone type

Primary phone •

## Promo codes and accounts

Promotion code ⓘ

Business Extra℠ / On Business

17



## Use caution when packing

Some everyday products, like electronic cigarettes and aerosol spray starch, can be dangerous when transported on the aircraft in carry-on and/or checked baggage. Changes in temperature or pressure can cause some items to leak, generate toxic fumes or start a fire. Carriage of prohibited items may result in fines or in certain cases imprisonment. Please ensure there are no forbidden hazardous materials in your baggage like:

By clicking Continue, I agree to the above Hazardous materials policy and the liquids, aerosols and gels regulations.

Continue

Hereinafter, this screen may be referred to as "**Screen 4: Passengers**," or as "Screen 4."

35.     As to Plaintiff's interaction with the "Price and tax information" link on Screen 4, Plaintiff hereby incorporates by reference Paragraph 31 as though fully set forth herein.

36.     As to Plaintiff's interaction with the "Bag and optional fees" link on Screen 4, Plaintiff hereby incorporates by reference Paragraph 23 as though fully set forth herein.

37.     The "TSA privacy notice" link on Screen 4 would, if clicked, have brought Plaintiff to a screen, titled "Privacy policy," that was substantively identical to that attached hereto as **EXHIBIT 4**. Plaintiff does not know whether she clicked on the "TSA privacy notice" link and viewed Exhibit 4, but seeing or not seeing the screen would not have affected whether she later possessed an objectively reasonable basis to believe she was accepting a contract offer upon clicking "Pay now" on Screen 6.

18

38.     Plaintiff was buying a flight for her nephew, Robert E. Burkett.[13]

39.     She typed his first, middle, and last name; date of birth; and gender into the appropriate boxes; selected "AAdvantage" as the frequent flyer program; and typed Mr. Burkett's frequent flyer number into the appropriate box. She left "Redress number" and "Known Traveler number" blank. Plaintiff typed Mr. Burkett's email address into the appropriate box; replicated same in the email confirmation box; indicated that Mr. Burkett's primary phone type is a cellular telephone; and typed same into the appropriate box. Plaintiff left the "Promotion code" and "Business Extra / On Business" box blank.

40.     The "Add special services" link on Screen 4 would, if clicked, have brought Plaintiff to a screen, entitled "Special service requests," that was substantively identical to that attached hereto as **EXHIBIT 5**. Plaintiff does not know whether she clicked on the "Add special services" link and viewed Exhibit 5, but seeing or not seeing the screen would not have affected whether she later possessed an objectively reasonable basis to believe she was accepting a contract offer upon clicking "Pay now" on Screen 6.

41.     The "Hazardous materials policy" link on Screen 4 would have brought Plaintiff to a screen, titled "Hazardous materials policy," that was substantively identical to that attached hereto as **EXHIBIT 6**. Plaintiff does not know whether she clicked on the "Hazardous materials policy" link and viewed Exhibit 6, but seeing or not seeing the screen would not have affected whether she later possessed an objectively reasonable basis to believe she was accepting a contract offer upon clicking "Pay now" on Screen 6.

42.     Plaintiff clicked the "Continue" button on the bottom of Screen 4.

---

[13] The to-be passenger Robert E. Burkett is not co-counsel. He is Plaintiff's nephew. He shares a name with his father, co-counsel here.

www.MasonKerns.com | MASON KERNS LAW | AAClassAction@MasonKernsLaw.com

*Screen 5: Choose your seat*

43.     Clicking "Continue" on Screen 4 brought Plaintiff to a screen substantively identical to that in the image directly below—which image Plaintiff incorporates by reference into this paragraph—except that the plane associated with Mr. Burkett's chosen flight, and the   attendant seating plan, may have been different than that depicted below, and, as explained below, Plaintiff likely, by sheer odds, selected a different seat[14] than the seat assigned to "Robert B." in the image.

---

[14] Albeit she did select a seat in the same class. *See* ¶ 45, *infra.*





Hereinafter, this screen may be referred to as "**Screen 5: Choose your seat**," or as "Screen 5."

44.     The "Seats terms and conditions" link on Screen 5, if clicked, would have brought Plaintiff to a screen, titled "Main Cabin," that was substantively identical to that attached hereto as **EXHIBIT 7**. Plaintiff does not know whether she clicked on the "Seats terms and conditions" link and viewed Exhibit 7, but seeing or not seeing the screen would not have affected whether she later possessed an objectively reasonable basis to believe she was accepting a contract offer upon clicking "Pay now" on Screen 6.

45.     Plaintiff selected a seat for Mr. Burkett. She is unsure of the exact seat number. She did, however, select an "Available" (dark blue in color, as opposed to red, green, or gray) seat in the Main Cabin, which did not increase the price of the flight. This selection turned the blue seat selected by Plaintiff into an blue numeral "1" inside of blue-outlined and white-

background circle, identical in composition to (but likely not in the same location as) that in the image of Screen 5 above.

46.     Following this selection by Plaintiff, the seat number chosen by Plaintiff also appeared and was visible to Plaintiff in the location where "19B" appears—to the right of the circled "1" next to "Robert B."—in the image of Screen 5 above.

47.     Robert Burkett's seat having been selected, Plaintiff clicked "Continue."

*Screen 6: Review and pay*

48.     Clicking "Continue" on Screen 5 brought Plaintiff to a screen substantively identical to that in the image directly below—which image Plaintiff incorporates by reference into this paragraph—except that the flight Plaintiff had selected for Mr. Burkett was on May 26, 2017; the flight number, departure date, and arrival dates were different; the travel time, aircraft, and seats entries likely were different; the number below "Your total" was an exact figure between $196.01 and $197.00, inclusive; the number corresponding with "Passenger x 1" was roughly $171; the number corresponding with "Taxes" was roughly $26.00; and the number corresponding with "Total (all passengers)" was was an exact figure between $196.01 and $197.00, inclusive.



[ADVERTISEMENT]

## How do you want to pay for your trip

### Select a payment option

◉ Credit/Debit card

○ Other forms of payment    6 month financing

○ Hold

( • Required)

| Card type • | Card number • | Expiration date • | Security code (CVV) • |
|---|---|---|---|

| First name • | Middle name | Last name • |
|---|---|---|

Country •

Change country

| Billing address 1 • | Billing address 2 |
|---|---|

| City • | State • | Postal code • |
|---|---|---|

[TRIP INSURANCE OFFER/ADVERTISEMENT]

www.**MasonKerns**.com  |  **Mason Kerns Law**  |  AAClassAction@MasonKernsLaw.com

## Email for receipt

( • Required)

Email •

**Fare Rules**

- You have up to 24 hours from the time of ticket purchase to receive a full refund  if you booked at least 2 days before departure. Refund policy ⧉
- We may give the government your information to comply with federal security regulations
- Optional service fees include bags, seats and upgrades. Optional service fees ⧉

Detailed fare rules ⧉

I agree to the privacy policy ⧉, terms and conditions ⧉ and refund policy ⧉.   →   ☑

Pay now

Hereinafter, this screen may be referred to as "**Screen 6: Review and pay**," or as "Screen 6."

49.     As to Plaintiff's interaction with the "Bag and optional fees" link on Screen 6, Plaintiff incorporates by reference Paragraph 23 as though fully set forth herein.

50.     The "Reservation and tickets FAQs" link on Screen 6 would have brought Plaintiff to a screen, titled "Reservation and tickets FAQs," that was substantively identical to that attached hereto as **EXHIBIT 8**. Plaintiff does not know whether she clicked on the "Reservation and tickets FAQs" link and viewed Exhibit 8, but seeing or not seeing the screen would not have affected whether she possessed an objectively reasonable basis to believe she

was accepting a contract offer upon clicking "Pay now" on Screen 6.

51.     As to Plaintiff's interaction with the "Price and tax information" link on Screen 6, Plaintiff incorporates by reference Paragraph 31 as though fully set forth herein

52.     The "Conditions of Carriage" link on Screen 6 would have brought Plaintiff to a screen, bearing the same title as that link, that was substantively identical to that attached hereto as **EXHIBIT 9**. Plaintiff does not know whether she clicked on the "Conditions of Carriage" link and viewed Exhibit 9, but seeing or not seeing the screen would not have affected whether she possessed an objectively reasonable basis to believe she was accepting a contract offer upon clicking "Pay now" on Screen 6.

53.     The "Refund policy" link on Screen 6 would have brought Plaintiff to a screen, titled "Customer service plan, substantively identical to that attached hereto as **EXHIBIT 10**. Plaintiff does not know whether she clicked on the "Refund policy" link and viewed Exhibit 10, but seeing or not seeing the screen would not have affected whether she possessed an objectively reasonable basis to believe she was accepting a contract offer upon clicking "Pay now" on Screen 6.

54.     The "Optional service fees" link on Screen 6 would have brought Plaintiff to a screen, bearing the same title as the link, that was substantively identical to the aforementioned Exhibit 1. Plaintiff does not know whether she clicked on the "Optional service fees" link and viewed Exhibit 1 while on Screen 10, but seeing or not seeing the screen would not have affected whether she later possessed an objectively reasonable basis to believe she was accepting a contract offer upon clicking "Pay now" on Screen 6.

55.     The "Detailed fare rules" link on Screen 6 would have brought Plaintiff to a screen, bearing the same title as the link, that was substantively identical to that attached

hereto as **EXHIBIT 11**, except that **the portions highlighted in Exhibit 11 would not have appeared on the screen during Plaintiff's May 25, 2017 encounter.** Plaintiff does not know whether she clicked on the "Detailed fare rules" link and viewed Exhibit 11 while on Screen 6, but seeing or not seeing the screen would not have affected whether she possessed an objectively reasonable basis to believe she was accepting a contract offer upon clicking "Pay now" on Screen 6.

56.    The "privacy policy" link on Screen 6 would have brought Plaintiff to a screen, bearing the same name as the link albeit with a capital "P" in "Privacy," that was substantively identical to the aforementioned Exhibit 4. Plaintiff does not know whether she clicked on the "privacy policy" link and viewed Exhibit 4, but seeing or not seeing the screen would not have affected whether she later possessed an objectively reasonable basis to believe she was accepting a contract offer upon clicking "Pay now" on Screen 6.

57.    The "terms and conditions" link on Screen 6 would have brought Plaintiff to a screen, titled "Detailed fare rules," that was substantively identical to the aforementioned Exhibit 11, except that the portions highlighted in Exhibit 11 would not have appeared on the screen during Plaintiff's May 25, 2017 encounter. Plaintiff does not know whether she clicked on the "terms and conditions" link and viewed Exhibit 11 while on Screen 6, but seeing or not seeing the screen would not have affected whether she later possessed an objectively reasonable basis to believe she was accepting a contract offer upon clicking "Pay now" on Screen 6.

58.    The second utterance of the "refund policy" link[15] on Screen 6 would have

---

[15] The "refund policy" link appears twice on Screen 6, albeit the "r" in refund is not capitalized in "refund" in the link's second incarnation. *Cf.* ¶ 53, *supra*. ("r" capitalized). Both instances link to Exhibit 10.

www.MasonKerns.com | MASON KERNS LAW | AAClassAction@MasonKernsLaw.com

brought Plaintiff to a screen substantively identical to the aforementioned Exhibit 10. Plaintiff does not know whether she clicked on this "refund policy" link and viewed Exhibit 10, but seeing or not seeing the screen would not have affected whether she later possessed an objectively reasonable basis to believe she was accepting a contract offer upon clicking "Pay now" on Screen 6.

59.     A footer substantively identical to that in the image directly below—which footer Plaintiff incorporates by reference into this paragraph—appeared at the bottom of all six screens, Screens 1 through 6, encountered by Plaintiff on May 25, 2017.

| Help | About American | Extras |
|------|----------------|--------|
| Contact American | About us | Business programs |
| Receipts and refunds | Careers | Gift cards |
| FAQs | Investor relations | American Airlines credit card |
| Agency reference | Newsroom | Trip insurance |
| Cargo | Legal, privacy, copyright | CoBrowse |
| Baggage and optional service fees | Browser compatibility | |
| Customer service and contingency plans | Web accessibility | |
| Conditions of carriage and tariffs | | |

Link opens in new window. Site may not meet accessibility guidelines.



Hereinafter, this screen portion may be referred to as the "**Footer**."

60.     Plaintiff did not click on any of the links in the Footer—or know of their existence. The links simply appeared at the bottom of every screen and were in no way, shape, or form, part of the bargain between the parties. American did not request that Plaintiff read or assent to any language contained in the links (except in instances where the pages to which these links lead are actually of the exhibits or pop-up windows mentioned above). Plaintiff

www.MasonKerns.com | MASON KERNS LAW | AAClassAction@MasonKernsLaw.com

did not assent to terms contained in the links by virtue of using the website, and attempting to book a flight—which she could completely accomplish without clicking a link, and indeed without scrolling to the bottom of any screen and seeing the links or otherwise learning of their existence. To the extent linked-to language purports to dictate legal rights of Plaintiff and the putative Class, such language is ineffectual because neither Plaintiff nor the Class agreed to be bound by such language. And even if, purely *arguendo,* Plaintiff could be bound by the language in the links, none of it would affect whether Plaintiff possessed an objectively reasonable basis to believe she was accepting a contract offer upon clicking "Pay now" on Screen 6.

### CONTRACT IS OFFERED; ACCEPTED; BREACHED

61.    Upon Plaintiff's viewing of Screen 6, American had manifested to Plaintiff that it was willing to enter into a bargain. It had offered airfare for a specified price under well-delineated terms that constitute all terms essential to air travel with a common carrier:

      a.   Date of flight;

      b.   Time of flight;

      c.   Distance of flight;

      d.   Flight time;

      e.   Departure airport;

      f.   Arrival airport;

      g.   Seating class, and all attendant benefits and burdens thereof;

      h.   Baggage policies;

      i.   Cancellation and rescheduling policies;

      j.   Seat number; and

www.MasonKerns.com | MASON KERNS LAW | AAClassAction@MasonKernsLaw.com

    k.   Other terms that appear in exhibits and pop-up windows referenced in this complaint.

62.    Plaintiff saw the offer on Screen 6; entered all information required by American for acceptance of the offer, including all payment—which information was valid and of a type explicitly accepted by American—and clicked "Pay now," thereby transferring the agreed-upon sum to American as consideration for the airfare she was to receive.

63.    American then refused to retain the payment Plaintiff transferred to it, and refused to perform as obligated under the contract.

64.    At the time American "revoked" its offer, Plaintiff had already accepted it while it remained a valid offer; the putative revocation was too late and thus no revocation at all.

65.    Plaintiff, after American breached the contract by refusing to provide the promised services for $197, was forced to use AAdvantage points worth the equivalent of $320 to purchase a ticket on the same DCA-MIA flight, in the same seating class, as the ticket she had previously purchased for $197.

66.    All Class Members went through substantially the same procedure as Plaintiff and, after they performed under the contract by entering all required information and paying American, American reneged on each of their contracts, refusing to perform by providing the promised airfare.

### III. CLAIM

#### COUNT I: BREACH OF CONTRACT

67.    Plaintiff and the putative Class, of which Plaintiff is a member, incorporate by reference Paragraphs 12 through 66 as though fully set forth herein.

www.MasonKerns.com  |  MASON KERNS LAW  |  AAClassAction@MasonKernsLaw.com

68.     The Airline Deregulation Act of 1978 does not preempt state breach-of-contract actions between consumers and an airline.[16]

69.     At all material times and as to its contract with each Class Member, American possessed the expertise to avoid falsely offering ticket prices (the bait), then changing the terms after it knowingly strings along the unsuspecting consumer (the switch),  but willfully chose not to change the system, for two reasons: (1) It would cost money to purchase the technology, hardware, and software to change the system; and (2) It would cost American hundreds of thousands of dollars in revenue to change the system because it would no longer receive the occasional $20, and even $40, increases in fares from people who, having had their first contract already breached and not wishing to start the process over on another web site, will relent and pay extra money for substantively identical airfare.

70.     Due solely to American's breach, each Class Member ultimately paid more money—ranging, for most Class Members, between $20 and $40—for a ticket on the same or substantively the same flight, in the same or substantively the same seating class, as their original purchased ticket.

71.     American's breach of its contract with Plaintiff for the $197 ticket[17] is part of a systematic and purposeful effort by American to dishonestly lure customers with contracts it knows it cannot honor, then fatten its coffers after the consumer—having already accepted the contract at a lower price—is forced to pay more for the same service.

72.     American created a reasonable expectation in the Class that American was

---

[16]*American Airlines v. Wolens,* 513 U.S. 219, 232-33 (1995).

[17] Plaintiff is not suing for the second breach, wherein American refused to honor the parties' contract for the $297 ticket **after** it refused to honor the contract for the $197 ticket, or any other of many contracts American made and breached with Plaintiff.

www.MasonKerns.com | MASON KERNS LAW | AAClassAction@MasonKernsLaw.com

willing to enter into a contract, by directly expressing to the Class a promise, undertaking, and/or commitment to enter into an agreement under certain and definite terms that constituted all terms essential for travel with a common carrier: Date, time, distance, departure site, arrival site, seat number and location, baggage policies, price, and all other terms referenced in Paragraph 61, *supra.* [18]

73.     The Class Members believed, as would any reasonable person in their position, that they could exercise the power given to them by American's offer to consummate the contract by providing all information required by American, including payment information, and clicking the "Pay now" button.

74.     Each Class Member manifested his or her assent to be bound by the terms of American's contract offer by checking a box indicating agreement to terms proposed by American, entering biographical information in the manner specified by American, and paying American in a manner American had deemed acceptable: Entering credit-card information and clicking the "Pay now" button, thereby transferring money to American.

75.     At the point at which the individual Class Members clicked "Pay now," they had accepted American's offer for a specific service at a specific price, and had performed under the contract by paying American.

76.     The money each Class Member paid American constituted valuable consideration.

77.     Likewise, American's promised provision of air carriage to each Class Member constituted valuable consideration.

---

[18] American's offers to the Class are sufficiently specific to be binding. *See Izadi v. Gus Machado Ford*, 550 So. 2d 1135, 1139 (Fla. 3d DCA 1989) (citing Annot., Advertisement Addressed to Public Relating to Sale or Purchase of Goods at the Specified Price As an Offer the Acceptance of Which Will Consummate a Contract, 43 A.L.R.3d 1102 (1972)).

www.MasonKerns.com | MASON KERNS LAW | AAClassAction@MasonKernsLaw.com

78.     The moment each Class Member clicked "Pay now," thereby accepting American's offer[19] and performing via payment, American became obligated to uphold its end of the bargain by rendering the services (chiefly, an airline flight) it had promised to provide in exchange for the Class Members' consideration.

79.     After extending an unambiguous offer for a specified service at a specified price and delineating the exact manner by which the Class was to enter into the agreement, and after each Class Member entered into the agreement in that precise manner and performed under the contract by paying American via the Internet, American reneged.

80.     American refused to accept the payment each Class Member had made and refused to provide the services it had promised, and in so doing breached its contract with each Class Member.

81.     American did not attempt to revoke its contract offer, if at all, until **after** each Class Member accepted the offer by clicking the "Pay now" button[20] and simultaneously paid American. Once each Class Member clicked the button, American was in receipt of their payments and unilaterally chose to give them back, thereby breaching the contract **after** each

---

[19] That this action by the Class constituted acceptance is black-letter law that has been applied recently and uniformly by the courts in the e-commerce context. *See, e.g., Ewers v. Genuine Motor Cars, Inc.*, No. 1:07 CV 2799, 2008 U.S. Dist. LEXIS 21466, at *14 (N.D. Ohio Mar. 18, 2008) ("**An enforceable contract existed** for the purchase of the van at the time plaintiffs hit the **'buy it now' button on EBay**.") (emphasis added); *Devries v. Experian Info. Sols., Inc.*, No. 16-cv-02953-WHO, 2017 U.S. Dist. LEXIS 26471, at *14-15 (N.D. Cal. Feb. 24, 2017) ("The text containing the Terms and Conditions hyperlink was located directly above that button and indicated that clicking 'Submit Secure [*15] Purchase' constituted acceptance of those terms.").

[20] "**If an offer is accepted** without conditions, and without varying its terms, **and the acceptance is communicated to the other party without unreasonable delay, a contract arises, from which neither party can withdraw at its pleasure**." *Am. Appraisal Assocs. v. Am. Appraisals, Inc.*, 531 F. Supp. 2d 1353, 1358 (S.D. Fla. 2008) (emphasis added) (citing RESTATEMENT OF CONTRACTS, § 64 and *Kendel v. Pontious*, 261 So. 2d 167, 169 (Fla. 1972) ("The trial judge and the District Court of Appeal in the case sub judice correctly held that the acceptance must be communicated to the offeror and that the offeror could revoke the offer provided the communication of such revocation is received [**8] **prior** to the acceptance.")); *see also id.* at 170 ("the **pivotal issue is whether the contract was revoked <u>before</u> acceptance**.") (emphasis added). Here, American attempted to revoke its offer and return the Class Members' payments **after** acceptance—i.e., too late.

www.MasonKerns.com | MASON KERNS LAW | AAClassAction@MasonKernsLaw.com

Class Member had already manifested his or her assent to American's definitive offer, and after performance under the contract by each Class Member. To the extent American wished to revoke its offer, it was too late. [21]

82.     No valid justification, at law or in equity, existed for American's breaches of its contract with any Class Member.

83.     As a direct and proximate result of American's breach, each Class Member was forced to find another airline ticket to replace the ticket he or she had bought and which American refused to honor.

84.     Each Class Member, in good faith and without unreasonable delay, found cover in the form of a higher-priced ticket on the same or a substantially similar flight.

85.     Each Class Member is entitled to recover from American the benefit of the bargain of the original contract offer, and/or the difference between the cost of their cover and their original contract price with American, plus incidental and consequential damages.

## IV. CLASS REPRESENTATION ALLEGATIONS

86.     Plaintiff incorporates the foregoing paragraphs by reference as though fully set forth herein.

87.     The Class is defined as follows:

> **All United States residents who: (1) accepted an American Airlines, Inc. offer to buy airfare on the airline's website by (a) navigating substantially the same airline website screens and content as**

---

[21] The flagship case on the issue, taught in most every law school in America, is *Lefkowitz v. Great Minneapolis Store, Inc.*, 86 NW 2d 689 (Minn. 1957). In *Lefkowitz*, a Minneapolis store published an advertisement stating, "Saturday 9 A.M. Sharp 3 Brand New Fur Coats Worth to $100.00. First Come First Served $1 Each." *Id.* at 690. Lefkowitz arrived with $1.00, wishing to buy a fur coat. *Id.* The store refused. *Id.* Lefkowitz sued. *Id.* The court held that the advertisement was sufficiently definitive as to constitute a contract offer, and the Lefkowitz, having successfully managed to comply with the terms of the advertisement, and having offered the state purchase price of the article, was entitled to performance on the part of the defendant. *Id.* at 691. *See also Izadi v. Gus Machado Ford*, 550 So. 2d 1135, 1139 (Fla. 3d DCA 1989) (citing *Lefkowitz* holding).

**Margaret Schultz and (b) clicking "Pay now" after entering valid payment information; (2) were informed by the airline that it was refusing to honor the fare; and (3) booked more costly, alternative airfare.**

### PREREQUISITES FOR CLASS REPRESENTATION (FED. R. CIV. P. 23(a))

88.     Certifying and maintaining this cause as a class action is both appropriate and necessary given the nature of the claims and in light of the following factors:

89.     **The members of the class are so numerous that separate joinder of each member is impracticable (Fed R. Civ. P. 23(a)(1): Numerosity).** Plaintiff conservatively alleges in Paragraph 5, *supra,* that there are more than 1,000,000 Class Members. Maintenance of 1,000,000 separate and nearly identical claims is untenable, would unnecessarily overwhelm the court system, and is best remedied by use of class litigation.

90.     **The claim or defense of the representative party raises questions of law or fact common to the questions of law or fact raised by the claim or defense of each member of the class (Fed. R. Civ. P. 23(a)(2): Commonality); and the claim or defense of the representative party is typical of the claim or defense of each member of the class (Fed R. Civ. P. 23(a)(3)): Typicality).** A chronology of events common to Plaintiff and to each Class Member demonstrates that American breached contracts with each Class Member in nearly identical fashion. Each Class Member, including Plaintiff, encountered Screen 7, which for each Class Member, including Plaintiff, was identical but for the (1) flight locations and (2) prices—the former of which is irrelevant to any analysis, and the latter of which affects only damages and not liability.[22] Having been falsely led to believe they were entering into a

---

[22] *See, e.g., Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("It would drive a stake through the heart of the class action device…to require that every member of the class have **identical** damages. **If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification.** Otherwise

contract with American by the exact same presentation and language by American, each Class Member had their contract with American immediately breached by American in a uniform and summary manner and without justification. Each Class Member, including Plaintiff, then incurred damages—losing the benefit of their bargain and being forced to book substantively identical airfare at a higher price—that can be calculated using the exact same formula. Thus, the only material difference among the Class Members, including Plaintiff, is as to the amount of total damages of each Class Member. An individual determination as to damages among a Class harmed by a defendant's uniform and systematic wrongs is insufficient to defeat class certification, and indeed such a scenario demands class action as the only option conducive to judicial economy.

Among the numerous questions of law and fact common to Plaintiff and to each Class Member are:

a. Whether American's display on Screen 6—which as indicated above was viewed substantially identically by Plaintiff and every Class Member—constitutes an offer or, rather, is an invitation to bargain;

b. Whether, under the circumstances encountered on a uniform basis on the payment screen by Plaintiff and all Class Members, a reasonable person in a Class Member's position would believe that American was willing to enter into an agreement under the terms proposed;

---

defendants would be able to escape liability for tortious harms of enormous aggregate magnitude but so widely distributed as not to be remediable in individual suits. As we noted in *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004), 'the more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30...The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as **only a lunatic or a fanatic sues for $30**.'") (emphasis added); *see also In re Checking Account Overdraft Litig.*, 307 F.R.D. 656, 666 n.5 (S.D. Fla. 2015) and *Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419, 429 (Fla. 2013).

www.**MasonKerns**.com | **MASON KERNS LAW** | AAClassAction@MasonKernsLaw.com

c.   Whether American's uniform offers as appear on the screen manifest an assent to be bound by the terms therein;

d.   Whether the Class Members manifested assent to the terms through the uniform actions they took as they moved through the various aa.com screens;

e.   Whether a valid contract was formed at the moment each Class Member clicked "Pay now";

f.   Whether entering valid payment information and clicking "Pay now" constituted performance under the contract by each Class Member;

g.   Whether the Class' breach-of-contract actions are preempted by the Airline Deregulation Act of 1978, 49 U.S.C. § 40101 *et seq.*;

h.   Whether the putative choice-of-law clause contained on the bottom of American's website—a pure "browse-wrap" agreement—was sufficiently conspicuous as to put the Class on notice that Texas law applies;

i.   Whether the choice-of-law clause is unenforceable as violative of the public policy embodied in the Airline Deregulation Act of 1978, 49 U.S.C. § 40101 *et seq.*; and

j.   Whether the aforementioned choice-of-law clause is unenforceable as unconscionable.

91.   **The representative party can fairly and adequately protect and represent the interests of each member of the class (Fed R. Civ. P. 23(a)(4): Adequacy).** Plaintiff is *sui juris,* intelligent, honest, and fair. She is a responsible, law-abiding citizen who believes that if a person (or entity) promises to do something, she or he (or it) should follow through with that guarantee, including honoring bargained-for agreements. Plaintiff raises this claim to

pursue justice on behalf of all consumers who have been wronged by American, which, buoyed by sheer size and in the interest of profit, has taken advantage of customers via deceptive practices. Plaintiff is an ideal class representative.

### TYPE OF CLASS ACTION (FED R. CIV. P. 23(b))

92.     Satisfaction of **either** subsection (b)(1), (b)(2), or (b)(3) of Fed R. Civ. P. 23 would allow this action to proceed in class form; this action is especially conducive to class action and disposition in that it meets all three criteria:

93.     **The prosecution of separate claims or defenses by or against individual members of the class would create a risk of either inconsistent or varying adjudications concerning individual members of the class which would establish incompatible standards of conduct for the party opposing the class, and adjudications concerning individual members of the class which would, as a practical matter, be dispositive of the interests of other members of the class who are not parties to the adjudications, or substantively impair or impede the ability of other members of the class who are not parties to the adjudications to protect their interests (Fed R. Civ. P. 23(b)(1).** If actions are pursued individually, and one court or jury rules that American's uniform actions toward its customers constituted a breach of contract and another adjudicates that it did not, the result would be untenable. The upshot would be American being told by one court that its actions constitute a breach of contract, and told by another court that its actions are legitimate and as such American can continue to operate in such a manner. Moreover, given the nearly identical nature of the claims, under collateral estoppel and *res judicata,* if thousands of claims are brought individually, the adjudications of individual members would likely be dispositive as to future claimants' rights, and thus these very important rights would essentially be decided in the

www.MasonKerns.com | MASON KERNS LAW | AAClassAction@MasonKernsLaw.com

subsequent plaintiffs' absence. Additionally, in lieu of class representation, early settlements of some cases could lessen the pool of money available to subsequent claimants, leading to an unjust result whereby an identically aggrieved plaintiff recovers nothing merely because he or she filed suit after many other plaintiffs.

94.     **The party opposing the class has acted or refused to act on grounds generally applicable to all the members of the class, thereby making final injunctive relief or declaratory relief concerning the class as a whole appropriate (Fed R. Civ. P. 23(b)(2)).** As shown *supra,* American has harmed every Class Member in substantively identical fashion. Declaratory and/or injunctive relief would signal to all Class Members whether they have a valid claim, furthering the interests of efficiency and finality.

95.     **The questions of law or fact common to class members predominate over any questions affecting only individual members and class action is superior to other available methods for fairly adjudicating the controversy (Fed R. Civ. P. 23(b)(3)).** As Paragraph 90, *supra*, demonstrates, dozens of questions of law or fact, which will control whether the Class is entitled to relief, are common to all Class Members. There is only one issue that varies with each individual Class Member: Dollar amount of damages, which will be determined pursuant to the same rubric as to all Class Members. Because meting out damages will be formulaic and because every other issue is the same for every Class Member, class action without question is the manner in which to resolve this dispute that most furthers the interest of judicial economy. Among all methods of adjudication, class action will be fairest for all parties and will reduce the burden on the courts, and will reduce attorney's fees and costs for all parties.

www.MasonKerns.com | MASON KERNS LAW | AAClassAction@MasonKernsLaw.com

## VII. REQUEST FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff individually, and Plaintiff on behalf of the putative Class, respectfully prays that the Court: Enter an order deeming Plaintiff the representative of the Class and the law firms below counsel for the Class; enter judgment for Plaintiff and the Class; and award money damages, costs, and pre- and post-judgment interest as allowed by law to the Class, and a reasonable attorney's fee to Class counsel.

## VIII. JURY TRIAL DEMAND

Plaintiff and the Class hereby demand a trial by jury as to all issues so triable.

Respectfully Submitted by:

/s/ *MиK*

**Mason Kerns** (FBN 91754)
mason@masonkernslaw.com
pleadings@masonkernslaw.com
**Jeremy Block** (FBN 91754)
MASON KERNS LAW, P.A.
1814 Southwest 22nd Avenue, Suite 6
Miami, Florida 33145
P 305.725.8300 | F 305.422.0400

**Robert E. Burkett, Jr.** (FBN 545074)
Burkett Law Office
5237 Summerlin Commons Boulevard, Suite 217
Fort Myers, Florida 33907
P 239.275.2145 | F 305.422.0400
bobburkettlaw@gmail.com
*Attorneys for Plaintiff* [23]

---

[23] Plaintiff has omitted a certificate of service per § 3K(4) of the CM/ECF Procedures for the United States District Court for the Southern District of Florida (Eff. Dec. 3, 2018).