**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 18-80633-CIV-ALTMAN/Brannon**

**MARGARET SCHULTZ**,

     *Plaintiff*,

v.

**AMERICAN AIRLINES, INC.**,

     *Defendant.*

_____/

**ORDER**[1]

**THIS MATTER** comes before the Court on American Airlines' ("AA") Sealed Motion for Summary Judgment ("MSJ") [ECF No. 91]. The Plaintiff, Margaret Schultz ("Schultz"), filed a Response ("MSJ Response") [ECF No. 104], and the matter ripened when AA filed its Reply ("MSJ Reply"). Both parties filed statements of undisputed material facts, which AA has combined into a single document. *See* Chart Summary of Parties' Positions Regarding Summary Judgment Facts ("Chart Summary") [ECF No. 112].[2]

**BACKGROUND**

On May 14, 2018, Schultz filed a putative class action against AA [ECF No. 1]. The operative complaint, now in its third iteration ("TAC") [ECF No. 59], asserts just a single breach

---

[1] With the Court's permission, the parties have submitted a number of filings under seal. Those filings shall remain under seal until further order of the Court. But, recognizing that "proceedings in the United States District Court are public and Court filings are matters of public record," *see* S.D. Fla. L.R. 5.4(a), this Order has been filed publicly.

[2] In citing to the record, the Court will rely exclusively on this combined Chart Summary. One thing to note: the Chart Summary does not restart its numbering sequence for AA's responses to the Plaintiff's Statement of Facts. For ease of reference, the Court will continue to use this sequential numbering system. So, for instance, the Plaintiff's first asserted fact—and AA's response to that "fact"—will be numbered as ¶ 49, rather than ¶ 1, and so forth.

of contract claim. In denying AA's Motion to Dismiss the TAC [ECF No. 38], the Court expressed grave reservations about whether Schultz's contract claim could survive a motion for summary judgment. *See* July 9, 2019 Order [ECF No. 79]. Specifically, the Court noted that, even taking the TAC's allegations as true, those allegations did not support Schultz's view that she had entered into a valid contract with AA to purchase a ticket for $197. *Id*. at 9. Instead, those allegations supported the inference that the ticket price Schultz *says* she saw was nothing more than "an offer to negotiate"—in other words, an advertisement. *Id*.

At a status conference on July 24, 2019, the Court granted the parties' request to conduct some additional discovery on "the operation of AA's pricing matrix, the number of consumers who purchased tickets for Schultz's flight while she was navigating through the order screens, whether Schultz's chosen seat could be reserved or otherwise held before she clicked 'pay now,' and the specific information AA conveyed to Schultz before she clicked 'pay now.'" *Id*. After some limited discovery on these issues, AA filed its Motion for Summary Judgment.

## THE FACTS[3]

### I.       AA's Online Ticketing System

AA is one of the largest airlines in the world. Chart Summary ¶ 1. At any given time, there are tens of thousands of people navigating AA's website (AA.com) in search of flights. *Id*. ¶ 6. Schultz, in fact, has purchased hundreds of tickets "from American" and "thousands of airplane tickets" for herself or others. *Id*. ¶ 21.

When setting prices for its various flight classes—these classes are often categorized by their alphabetical designations, such as V class, L class, M class, or Y class—an AA "Pricing team" creates different fare rules for each class. *Id*. ¶ 8. AA's proprietary algorithm, in turn, sets a

---

[3] Unless otherwise noted, the following facts are either undisputed or uncontested.

limit on the number of tickets in each class that can be sold for any given flight. *Id.* ¶ 9. This algorithm analyzes the interplay between several quantitative factors—e.g., expected demand, seat availability, historical trends, and competitor flights, among others—and then determines the specific fare for every ticket. *Id.* Schultz concedes that there are only a certain number of seats on each flight—and she admits that, for each flight, there are only a limited number of fares within each fare class. *Id.* ¶ 41.

In 2017, when Schultz purchased the ticket at issue here, customers looking to book a domestic flight on AA.com had to proceed through several webpages, including: (1) the "Departure and Destination" homepage, where the customer would enter his or her flight preference information; (2) the "Choose Flights" page, where the customer would select a flight and fare class; (3) the "Passengers" page, where the customer would enter the traveling passenger's personal information; (4) the self-explanatory "Choose Your Seat" page; (5) the "Review and Pay" page, where the customer would input his or her payment information;[4] and (6) the "Finish" page. *Id.* ¶ 11.

Schultz contends that, once a customer clicked "Pay Now" on the "Review and Pay" page—which would happen *before* the customer reached the "Finish" page—that customer had entered into a binding contract with AA. *Id.* ("Under the Plaintiff's theory, a contract is consummated before a customer reaches the 'Finish' page."). AA counters that, even after the customer clicked "Pay Now," that customer would still have to navigate the following additional steps before AA would issue that customer a valid ticket: (1) AA would verify that the customer had sufficient funds; (2) AA would charge the customer's credit card (or other payment method);

---

[4] It is on this page that the customer, after inputting his or her payment information, would click "Pay Now."

and (3) AA would confirm that the passenger was cleared to fly by the relevant regulatory authorities. *Id.* ¶ 16.

## II.   Schultz's Flight

Schultz testified that, on May 25, 2017, at approximately 7:00 p.m. Eastern Standard Time ("EST"), she saw a flight listed on AA's website for $197. *Id.* ¶ 33. But, according to Schultz, when she "clicked" on the corresponding link to pay—which she did only after proceeding through a series of screens that prompted her to enter her passenger and credit card information—the price of the ticket had inexplicably increased to $297. *See* TAC ¶ 71 n.17. Despite her frustration, at 7:55 p.m. EST—some 55 minutes after she started—Schultz bought a ticket on that same flight for $379, which apparently included all applicable taxes and fees. *See* MSJ Exhibit 7 (Schultz's booking information) [ECF No. 91-9].[5]

Although Schultz attached to her TAC what she calls "substantively identical" printouts of the pages she says she encountered on her journey to the "Pay Now" button, she did not include a copy of the page she allegedly saw *after* she clicked "Pay Now." Instead, Schultz avers that, after she clicked "Pay Now," AA's website told her that her request "cannot be processed." Chart Summary ¶ 62. Notably, AA collected no money from Schultz, issued her no ticket, and never directed her to the "Finish" page. *Id.* ¶¶ 34-36. Nor did Schultz adduce any evidence that, after she clicked "Pay Now," AA attempted in some way to charge her credit card.

AA, for its part, has introduced a summary exhibit ("Compilation Chart") [ECF No. 91-7],[6] which establishes that, on May 25, 2017, fourteen people—including Schultz—purchased

---

[5] Schultz insists that she bought her $379 ticket at 10:30 p.m. EST—three and a half hours after her search began. *See* Chart Summary ¶ 37.

[6] Schultz objects to this piece of evidence, which is little more than a compilation—taken from AA's electronic records—of all the tickets AA sold on that day for the flight at issue here.

tickets for the flight in question. *Id.* ¶ 42. Of these, five successfully booked a V class fare—that is, a ticket in the $197 range. *Id.* ¶ 43. But, according to AA's records, the last available V class fare for Schultz's flight was sold no later than 3:39 p.m. EST—more than three hours and twenty minutes *before* Schultz says she saw a ticket at that price on AA.com. *Id.* ¶ 45. In other words, after 3:39 p.m., AA's records show that the only remaining seats on Schultz's chosen flight cost *more than* $197. *Id.* ¶ 46. Nevertheless, Schultz has repeatedly insisted, under oath, that she "knows for a fact" that she saw a ticket at that price at 7:00 p.m. *Id.* ¶ 33.

## THE LAW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). In determining whether to grant summary judgment, the Court must consider "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable factfinder to rule for the non-moving party. *Id.*

At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See*

*e.g., Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence that a genuine issue of material fact precludes summary judgment. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); Fed. R. Civ. P. 56(e). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992).

Notably, assessments of credibility—no less than the weighing of evidence—are fact questions not susceptible of disposition at summary judgment. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). The Court must analyze the record as a whole—and not just the evidence the parties have singled out for consideration. *See Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987). If there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)).

Finally, to survive a motion for summary judgment, the non-movant must do more than rely on bald speculation and conclusory allegations. *See Cooper v. Southern Co.*, 390 F.3d 695, 745 (11th Cir. 2004) (holding that summary judgment was appropriate where the plaintiff relied only on conclusory assertions that were based entirely on her own subjective beliefs), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457-58 (2006); *see also Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) ("Conclusory, uncorroborated allegations by a plaintiff . . . will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion."); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)

("unsupported speculation" insufficient to satisfy a party's burden of producing evidence to withstand summary judgment).

## ANALYSIS

### I.  The Extra Discovery

At a status conference on July 24, 2019, the parties acknowledged that they had missed a number of Court-imposed deadlines—including the class certification deadline, the fact discovery deadline, the expert discovery deadline, the final discovery deadline, and the dispositive motions deadline. *See* [ECF Nos. 84 & 85]. Although the parties apologized for missing these deadlines, they failed to proffer—let alone establish—any "good cause" under FED. R. CIV. P. 16 for an extension of these deadlines. Nevertheless, at the request of both parties—and in the interest of justice—the Court granted the parties a limited window within which to take some additional discovery and, if necessary, to file their motions for summary judgment. *See* [ECF No. 84].

During this added discovery period, AA submitted the declarations—and deposition testimony—of two employees. The first, David Yienger ("Yienger")—a Technical Lead Software Engineer in the Agent Manage Travel Department—testified that: (1) AA's online booking procedures includes a six-step process that culminates in a "Finish" page; (2) the "Pay Now" screen is thus not the final page in the process; and (3), even after the customer clicks "Pay Now," AA will not issue a ticket until that customer reaches the "Finish" page—at which point AA must first verify both that the customer has sufficient funds to cover the ticket and that the person is cleared to fly by the relevant regulatory authorities. *See generally* Yienger Decl. [ECF No. 91-4].

The second witness, Scott Chandler ("Chandler")—a Managing Director for Asia/Pacific Revenue Management—attested that: (1) AA.com's proprietary algorithm determines the price of

every ticket on the basis of several factors, including supply and demand; (2) Schultz's $197 fare was available on May 25, 2017 as a "V class" fare; (3) AA sold out of the V class tickets no later than 3:39 p.m. EST; and (4) AA's Compilation Chart is a "true and correct summary of data contained on [AA's] Mosaic [database]." *See generally* Chandler Decl. [ECF No. 91-6].

Schultz objects to the testimony of both witnesses. With respect to Yienger, Schultz contends that he has impermissibly provided what amounts to expert opinion in the guise of lay-witness testimony. Chart Summary ¶ 12. But the Eleventh Circuit has recognized that, under Federal Rule of Evidence 701, officers or employees may offer their lay opinion testimony, not because they are experts, but because of the "particularized knowledge" they have acquired about their own company's business practices.

> [M]ost courts have permitted [owners and officers] to testify . . . without the necessity of qualifying the witness as an . . . expert. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

*United States v. Hill*, 643 F.3d 807, 841 (11th Cir. 2011) (citing *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.*, 320 F.3d 1213, 1218 (11th Cir. 2003) (permitting multiple employees, including a project manager and a consultant, to testify as lay witnesses about company's business practices)). Here, Yienger "work[s] on the code that determines how [AA's] website functions." Yienger Decl. ¶ 2. Yienger's testimony, in short, was based on his own "particularized knowledge" about AA's booking process—acquired through years of experience at the company. Yienger's Declaration, no less than his deposition testimony, is therefore admissible, and the Court will consider it.

With respect to Chandler's testimony, Schultz argues that the Compilation Chart upon which he relied is not a business record—and that, as such, his testimony about what it says is

inadmissible hearsay. Chart Summary ¶ 37. The Compilation Chart is a summary of every ticket AA sold on May 25, 2017 for the flight at issue in this case. As Chandler explained, the data AA used to compile the Compilation Chart was generated contemporaneously with each ticket's purchase and is maintained by AA in the ordinary course of its business. *See* Chandler Decl. [ECF No. 91-6 at ¶¶ 6-8]; *see also* Chandler Certification of Business Record [ECF No. 110-1 at ¶ 6]. AA did, it is true, create the Compilation Chart for the Court's benefit. Nevertheless, the Chart is, for several reasons, plainly admissible.

*First*, Schultz does not dispute AA's contention that, in the ordinary course of its business, AA maintains, in its Mosaic system, all the data contained in the Compilation Chart. Instead, Schultz argues that "[t]he fundamental problem with the Chandler [Declaration] is a disconnect between the Mosaic system—with which Chandler is familiar and from which data generation is probably a regular business practice—and the creation of charts using select data from the Mosaic system . . . ." Chart Summary ¶ 37. But, in his Declaration, Chandler attested that the Compilation Chart's data was lifted directly from the Mosaic system with which he is unquestionably familiar. Chandler Decl. ¶¶ 6-8. Schultz never explains how Chandler can be sufficiently familiar with the data from the much larger—and far more complex—Mosaic system and yet insufficiently familiar with a spreadsheet that simply regurgitates certain specific—and relevant—line items from that larger system.

In any event, courts in this Circuit have routinely admitted chart summaries or data compilations as exceptions to the prohibition against hearsay. *See, e.g.*, *Democratic Republic of the Congo v. Air Capital Grp., LLC*, No. 12-20607-CIV, 2014 WL 11429051, at *5 (S.D. Fla. Mar. 19, 2014), *aff'd*, 614 F. App'x 460 (11th Cir. 2015) (summary chart of otherwise admissible evidence, including business records and invoices, was admissible); *First State Bank of Nw.*

*Arkansas v. Georgia 4-S Investments LLLP*, No. 1:09-CV-2828-ODE,  2010 WL 11636133,  at *5 (N.D. Ga. Oct. 5, 2010) ("[E]ven though Plaintiff's [data compilation] . . . contains hearsay, the evidence is admissible under hearsay exceptions codified in the Federal Rules of Evidence."). More relevant here, Federal Rule of Evidence 1006 expressly permits the use of "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." [7] To the extent that the Compilation Chart will spare the Court and the parties from having to engage in the time-consuming—and unnecessary—task of scouring through the Mosaic system for the few bits of data that are relevant here, the Compilation Chart—which takes up less than a single printed page—performs a valuable function and fits squarely within the ambit of Rule 1006.

*Second*—and notably—Schultz did nothing in discovery to flesh out the Compilation Chart's accuracy. Indeed, although she took Chandler's deposition [ECF No. 104-4], she appears to have asked him no questions either about the Compilation Chart's authenticity or its accuracy—this, despite the fact that the chart rather compellingly contradicts her own account of the facts. Moreover, Schultz does not appear to have asked *any* AA employee questions about the Compilation Chart's authenticity or its accuracy. Schultz, in short, cannot now credibly dispute AA's assertions about the manner in which the Compilation Chart was composed—or the quality of the data it contains.

*Third*—and relatedly—two months *before* the summary judgment deadline, AA produced the Compilation Chart to Schultz in open court (and later produced the underlying Mosaic data it used to compile that Chart). *See* MSJ Reply at 8 n.5. Schultz has filed no motion contesting the

---

[7] The Rule further requires that the "proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court." FED. R. EVID. 1006.

veracity of that underlying data, nor has she suggested that AA's employees were dissembling when they consistently testified that the Compilation Chart simply summarizes that data. Schultz, again, cannot now baselessly speculate that the chart is, to use her words, "untrustworthy" or "inadmissible" when she has adduced no evidence from which the Court might reasonably conclude either that the chart was fraudulently created or else that the information it contains is somehow incorrect. Chart Summary ¶ 37.

*Fourth*, the Compilation Chart is plainly relevant. As the Court made clear—both in its July 9, 2019 Order and at the July 24, 2019 Status Conference—the viability of Schultz's claim turns on fluctuations in available inventory that, as the Court surmised, necessarily result from the reality that, at any given time, tens of thousands of people are looking for flights on AA's website. *See* July 9, 2019 Order at 8-9. As seats are sold, the Court assumed, the price of any remaining seat increases. *Id.* at 7-8. And, the Court explained, if this were true, if "the availability of Schultz's seat—no less than the price Schultz would have to pay for that seat—was subject to the vagaries of supply and demand, Schultz [would have] failed to show that AA's advertised fare was 'clear, definite, and explicit, and le[ft] nothing open for negotiation.'" *Id.* at 8 (quoting *Kolodziej v. Mason*, 774 F.3d 736, 743 n.11 (11th Cir. 2014)). Nevertheless, the Court denied AA's Motion to Dismiss, not because these suppositions were untrue, but because they were, at that stage, *unproven*. *Id.* at 10. Chandler's Declaration, then—with its reliance on the Compilation Chart and its emphasis on data—provides the evidentiary support for the inferences the Court had (perhaps prematurely) drawn.

Indeed, as the Court will soon explain, the Compilation Chart is relevant for an entirely different reason—one the Court had not considered in ruling upon the Motion to Dismiss: it flatly and unambiguously contradicts Schultz's version of the facts. To recap: the Compilation Chart

shows that, in the earlier parts of May 25, 2017, AA was in fact selling tickets for Schultz's flight at around $197 (a V class fare). *Id.* But the Compilation Chart also reveals that AA sold out of the last V class fare for that flight by no later than 3:39 p.m. EST. *Id.* And, in row 10, the Compilation Chart shows the actual ticket Schultz bought—at 7:55 p.m. *Id.*; *cf.* MSJ Exhibit 7 (Schultz's booking information) [ECF No. 91-9]. If the Compilation Chart is accurate, in other words, Schultz never saw a ticket on AA.com for $197, as she now claims, at 7:00 p.m. For all of these reasons, the Court will consider Chandler's Declaration and the Compilation Chart upon which it relies.

## II.     AA's Motion for Summary Judgment

AA offers two principal arguments in support of its Motion for Summary Judgment. *First*, AA says that it was unreasonable, as a matter of law, for Schultz—an experienced AA customer who has purchased hundreds of airplane tickets online—to believe that the mere act of filling out an online order form "completes a contract for that limited inventory absent confirmation from the seller." MSJ at 7. *Second*, AA points out that the documentary evidence in the case unambiguously—and, in AA's view, conclusively—undermines the salient averments of the TAC. MSJ at 8. Specifically, AA says that, according to its records, Schultz's suggestion that she saw a V Class fare for $197 on AA.com at 7:00 p.m. EST is, to put it mildly, simply untrue. *See id.* (It is "impossible that a $197 fare was even advertised, let alone available for purchase, when [Schultz] allegedly attempted to book the fare [at 7:00 p.m. Eastern time]."). Because this second argument, if correct, would dispose of the entire case, the Court will address it first.

### A. The Evidentiary Record Blatantly Contradicts Schultz's Story

At summary judgment, AA has the burden of proving the absence of a genuine issue of material fact, and all factual inferences must be drawn in favor of Schultz. *See e.g.*, *Allen*, 121 F.3d at 646. But, to survive summary judgment, Schultz *must* do more than show some "metaphysical

doubt" as to the material facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Indeed, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

And, to be clear, Schultz's "story is . . . blatantly contradicted by the record." *Id.* According to her testimony, at 7:00 p.m. EST on the night of May 25, 2017, she logged onto AA.com to purchase a ticket. Chart Summary ¶ 33. When she saw a fare for $197, she selected it, proceeded through five screens, and then clicked "Pay Now"—at which point AA's online portal informed her that her transaction "cannot be processed." Chart Summary ¶ 62. But, apart from her own self-serving testimony, Schultz has introduced no evidence to support any of these claims. And, although her TAC includes some inapposite printouts of what AA's website allegedly looked like on the night of May 25, 2017, it conspicuously failed to include any images of Schultz's specific transaction—including, most notably, any image of (1) a $197 fare being advertised at 7:00 p.m. EST or (2) the "cannot be processed" page she says she saw. *See* Series of "Substantively Identical" AA Website Images, TAC ¶¶ 20-50. This is not surprising—because the evidentiary record makes clear beyond peradventure that Schultz saw no such fare at 7:00 p.m. EST (or at any time thereafter).

Again, the $197 V class fare *was available* earlier in the day on May 25, 2017—and, very likely, Schultz saw this fare while she was browsing AA's website during that time. But AA sold its last V class fare of the day for that flight by no later than 3:39 p.m. EST. Chart Summary ¶¶ 42-46. By 7:00 p.m., in other words—when, according to Schultz, she began searching for flights on AA.com—AA was offering only more expensive fares on its website. *Id.* And so, when Schultz

actually bought her ticket at 7:55 p.m. EST,[8] she—and the five other customers who purchased tickets after her—paid the higher price (approximately $379 with taxes and fees). *Id.* ¶ 62; *cf.* Compilation Chart, Row 10 [ECF No. 91-7] & Schultz's Booking Information [ECF No. 91-9]. Notably, there is no record of any effort by Schultz to purchase a ticket on AA.com for $197 *at any point* on May 25, 2017. *See* Chart Summary ¶ 62.

Schultz does not contest the accuracy of AA's records.[9] Instead, she suggests, without any evidentiary basis, that AA's website "had to have" malfunctioned when it advertised a fare that did not exist. Chart Summary ¶ 12 ("The Plaintiff's testimony, however, establishes that [AA's] system had to have erred on [May 25, 2017], as it allowed her to proceed . . . [and display] a ticket that was not actually available."); *see also* MSJ Response at 5 ("American's inability to eliminate the possibility of error in its computer code or the code of the company upon which it is dependent establishes a genuine issue of material fact as to whether the Plaintiff observed a fare for $197.00").

But Schultz cannot defeat summary judgment by baldly claiming that "her own recollection is superior to the documentary evidence and that any conflict should be resolved at trial." MSJ Reply at 12.[10] And, while a plaintiff's testimony may not ordinarily be discounted at summary

---

[8] Schultz insists that she bought her ticket at 10:30 p.m. EST. Chart Summary ¶ 37.

[9] She does, of course, challenge the admissibility of the Compilation Chart Chandler attached to his Declaration. *See* "Analysis," Section I, *supra*. But she does not deny either that the chart simply summarizes certain relevant Mosaic records or that those underlying Mosaic records are, as AA claims, true and accurate records that were generated contemporaneously with the events they describe.

[10] In her attempt to parry AA's argument that she could not have seen a $197 offer when she logged into AA.com, Schultz submitted a note she says she drafted on the night of May 25, 2017—when, in her words, AA "failed to honor the $197.00 offer." MSJ Response at 4. "One would assume," Schultz contends, "that if American is correct that no such inventory existed for a $197.00 fare at 7:00 p.m. that evening, then the Plaintiff could not *possibly* have seen it posted on American's website, or known about it at all." *Id.* But Schultz assumes too much. In fact, Schultz's knowledge that a $197 ticket was available on May 25, 2017 supports AA's view—which is corroborated by the documentary evidence—that Schultz saw a $197 ticket on AA.com *earlier in the day* on May 25, 2017. MSJ Reply at 8 n.6. Schultz, of course, cannot admit that the events she says occurred

judgment, the Court may disregard self-serving testimony that is "blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed[.]" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013). Indeed, where, as here, the uncontroverted documentary record—like the Compilation Chart Chandler attached to his Declaration—so squarely contradicts a plaintiff's story as to render it implausible on its face, summary judgment is appropriate. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) ("Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.").

Nor, in the face of this objective documentary evidence, need the Court credit Schultz's unsupported allegation—based entirely on her own subjective speculation—that AA's website "had to have" malfunctioned.[11] *See Cooper*, 390 F.3d at 745 (holding that summary judgment was appropriate where the plaintiff relied on conclusory assertions that were based entirely on her own subjective beliefs); *see also Solliday*, 413 F. App'x at 207 ("Conclusory, uncorroborated allegations by a plaintiff . . . will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion."); *Cordoba*, 419 F.3d at 1181 ("unsupported speculation" does not satisfy a party's burden of defending against a summary judgment motion); *Phillips v. Publ'g Co., Inc.*, No. CV213-069, 2015 WL 5821501, at *30 (S.D. Ga. Sept. 14, 2015) (refusing, at summary judgment, to rely on the non-movant's own statements when those statements were

---

at 7:00 p.m. really took place before 3:39 p.m., because she would then have to explain how it was reasonable for her to assume that she could begin to reserve her ticket on AA.com, walk away from her computer for a few hours, and then expect that her ticket would still be sitting there—at the same price—whenever she was finally ready to buy it.

[11] While Schultz may testify about her own experiences, her theory that AA's website "had to have" malfunctioned is based entirely on speculation.

squarely contradicted by other evidence in the record).

Schultz, in short, asks this Court to accept as true her wholly-uncorroborated, self-serving testimony—even though the thrust of that testimony is, given the objective documentary record, implausible. This the Court cannot—and will not—do. Because Schultz could not have seen a ticket for $197 on AA.com at 7:00 p.m.—or at any time thereafter—she could not have suffered the injury she has alleged. She could not, in other words, have clicked "Pay Now" after 7:00 p.m. only to have the AA.com portal inexplicably tell her that her $197 purchase order "cannot be processed." And, since that inexplicable price hike is the very gravamen of her breach-of-contract claim, without it, there remain no genuine issues of material fact in the case. For this reason—and the ones that follow—the Court hereby **GRANTS** AA's Motion for Summary Judgment.

### B. There was no Contract

Even accepting the TAC's allegations as true, the Court remains unconvinced that Schultz ever entered into a valid contract with AA for a V class fare. As the Court explained in its Order on the Motion to Dismiss:

> It is axiomatic that a "manifestation to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." RESTATEMENT (SECOND) OF CONTRACTS § 26 (1981). Under Florida law, "[t]he test of the true interpretation of an offer or acceptance is not what the party making it thought it meant or intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Izadi v. Machado (Gus) Ford, Inc.*, 550 So. 2d 1135, 1139 (Fla. 3d DCA 1989). And courts generally consider it unreasonable for a person to believe that an advertisement constitutes a binding offer. *See Mesaros v. United States*, 845 F.2d 1576, 1581 (Fed. Cir. 1988). For this reason, advertisements are "not ordinarily intended or understood as offers to sell." RESTATEMENT (SECOND) OF CONTRACTS § 26 cmt. c. *See also Armour Group, Inc. v. Labock*, No. 11-61991, 2012 WL 12837289, at *7 (S.D. Fla. 2012) (finding that an advertisement typically constitutes a solicitation to bargain—and not an offer); *Leonard v. Pepsico, Inc.*, 88 F. Supp. 2d 116, 123 (S.D.N.Y. 1999), *aff'd*, 210 F.3d 88 (2d Cir. 2000) ("An advertisement is not transformed into an enforceable offer merely by a potential offeree's expression of willingness to accept the offer through . . . completion of an

order form."); *Mesaros*, 845 F.2d 1580 ("The great weight of authority" suggests that order forms are "mere notices and solicitations for offers which create no power of acceptance in the recipient."). The only exception to this general rule arises when an advertisement is "clear, definite, and explicit, and leaves nothing open for negotiation." *Kolodziej*, 774 F.3d at n. 11.

July 9, 2019 Order at 5-6.

With the benefit of discovery, the Court now concludes that, even if the record supported the TAC's averments, Schultz and AA never entered into a valid contract for a V class fare. As she did in responding to the Motion to Dismiss, Schultz claims to have reasonably believed that, by clicking "Pay Now," she was completing a valid contract because "all terms essential to air travel with a common carrier had been defined," and the order form was "clear, definite, and explicit, and left nothing open for negotiation." MSJ Response at 10. But the objective record evidence conclusively undermines this contention. As AA has pointed out: (1) Schultz completed only five of the six steps that AA's online ticketing portal requires; (2) Schultz never reached the "Finish" page;[12] (3) AA made no attempt to verify Schultz's payment method; (4) AA never billed Schultz or attempted to do so; and (5) AA never confirmed with the relevant regulatory authorities that Schultz was cleared to fly. *See generally* Yienger Decl.

Moreover, the "final screen" Schultz says she saw just before she clicked "Pay Now" specifically and expressly incorporated AA's "Conditions of Carriage," which appeared in a "clickable" link *immediately adjacent* to the advertised ticket price. [ECF No. 59-9]. And the very first sentence of those "Conditions of Carriage" explicitly admonished Schultz that "[y]our *ticket* and the following Conditions of Carriage constitute the *contract* between you, the passenger, and American Airlines, Inc. . . . ." *Id.* at 1 (emphasis added). In other words, a passenger's contract with AA is composed of (1) the issued ticket and (2) the terms and conditions set out in the

---

[12] *See* MSJ at 10; Yienger Decl. [ECF No. 91 ¶ 4]; *cf.* Schultz's TAC ¶¶ 20-50.

"Conditions of Carriage." Schultz concedes that AA never accepted her money or issued her a ticket—two facts that, per the express terms of the "Conditions of Carriage," belie her contention that the order form she filled out constituted her acceptance of an offered contract. *Cf. Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1373 (11th Cir. 2005) (finding an offer where document in question made clear that it was a contract, established the terms of the contract, and explained the means by which the contract could be accepted).

Given these undisputed facts, it would have been unreasonable for Schultz to believe that, by only partially completing AA's online booking process, she had consummated a valid contract for a V class fare.[13]

One final point: Schultz is, of course, correct when she notes that "American's system is designed to pull a fare out of the inventory available to other [potential] passengers for a 15-minute period to permit a customer to decide whether to accept American's offer of that fare." Chart Summary ¶ 12; *see also id.* ¶ 14 ("If the fare remains available after a customer clicks 'Continue' at the bottom of the 'Passengers' page, the fare is pulled out of the inventory available to other passengers for a 15-minute period to permit the customer to attempt to complete the booking."). But this "hold" does not, as she claims, suddenly render reasonable her view that AA had offered

---

[13] In Schultz's view, no objectively reasonable consumer would have understood that AA's "Conditions of Carriage" were a necessary component of the online booking process. *See* MSJ Response at 16. In support, she argues that the link to the "Conditions of Carriage" was "placed among three insignificant links," "tiny in size," and "multiple scrolled computer screens away from the focal point of the screen—the 'Pay Now' button." *Id.* And, she adds, because AA did not require her to confirm that she had read the "Conditions of Carriage," she cannot now be bound by its terms. *Id.* at 16-20. But, as AA notes, this argument is "self-defeating." MSJ Reply at 6. Either Schultz knew that her acceptance of AA's "Conditions of Carriage" was an element of her online transaction—in which case its plain terms conradict her position that she consummated a contract with AA merely by clicking "Pay Now"—or else the "Conditions of Carriage" were hidden within the "offer," in which case the "offer's" terms were not so "clear, definite, and explicit" as to leave "nothing open for negotiation." *See Kolodziej*, 774 F.3d at 744.

her a specific fare, which she was entitled to accept *at any future point*. MSJ Response at 11.

As a preliminary matter, Schultz never mentioned this "hold" in her TAC—presumably because she did not know about it until now. And, if she did not know about it until now, then it could not have influenced her thinking as to whether she had entered into a valid contract with AA when she clicked "Pay Now." [14] In either case, this 15-minute "hold" is only further evidence that, in the circumstances presented here, no valid contract was formed.

As the Federal Circuit Court of Appeals has said in a different, but related, context:

A basic rule of contracts holds that whether an offer has been made depends on the objective reasonableness of the alleged offeree's belief that the advertisement or solicitation was intended as an offer. *Generally, it is considered unreasonable for a person to believe that advertisements and solicitations are offers that bind the advertiser. Otherwise, the advertiser could be bound by an excessive number of contracts requiring delivery of goods far in excess of amounts available.*

*See Mesaros*, 845 F.2d at 1580 (emphasis added). The plaintiffs in *Mesaros* were coin collectors who sued the United States Mint for failing to send them certain commemorative coins they had ordered. Demand for the coins had "far exceeded the Mint's expectations," as a result of which the Mint had been unable to satisfy every order it received. *Id.* at 1578. The *Mesaros* Court held that the order forms the plaintiffs had filled out were not offers susceptible of acceptance. *Id.* at 1581. To the contrary, "[s]ince the coins could be paid for with checks, money orders, or credit cards, it would have been impossible for the Mint to have processed the sales on a first-come, first-served basis." *Id.*

---

[14] Of course, as the Court explains more fully below, if Schultz *did not* believe that AA was "holding" the $197 fare for her, then she would have understood that another customer could have bought her ticket before she did. On the other hand, if she knew that, for *some reasonable amount of time*, the fare would be reserved for her, then she would have recognized that, from the beginning of her process through its completion, AA would be checking her online progress against that timeframe—whatever it was. In other words, whatever she thought, it would have been unreasonable for her to believe that the mere act of clicking "Pay Now" somehow constituted the end of the booking process.

Like the coin collection in *Mesaros*, the market for AA's tickets is governed by the laws of supply and demand. *See* July 9, 2019 Order, at 9. An airplane, in other words, cannot accommodate every person who might want a seat on a particular flight. As seats are sold, supply decreases, and the price of any remaining seat increases. *See id.* at 6 n.3; *see also* Chart Summary ¶¶ 9-10. And, as the Court explained in its Order on AA's Motion to Dismiss, if "the availability of Schultz's seat—no less than the price Schultz would have to pay for that seat—was subject to the vagaries of supply and demand, Schultz [would have] failed to show that AA's advertised fare was 'clear, definite, and explicit, and le[ft] nothing open for negotiation.'" *Id.* at 8 (quoting *Kolodziej*, 774 F.3d at 743 n.11).

In this respect, the 15-minute "hold," far from supporting Schultz's position, establishes that AA did nothing more than advertise a class of seats on a particular flight at a particular price— *but only for a limited time* and, therefore, subject to inherently indefinite terms.[15] After all, with tens of thousands of people scouring its website at any given moment, AA needs a mechanism to ensure that anyone who wants to buy a flight—and to whom AA is prepared to sell a ticket—has an adequate opportunity to complete his or her purchase. The 15-minute "hold" thus functions as a kind of artificial queue, in which every potential customer stands in line, as it were, behind the person in front. As with a live queue, AA reserves the right to prevent customers at the back from, so to speak, cutting the line—in this example, by poaching a seat from another customer within

---

[15] To the extent that other customers could buy a particular seat before Schultz did, both the availability of that seat—and its price, which is a function of supply and demand—are inherently *indefinite* terms. Nor does the 15-minute "hold" render these terms any more definite because, as a result of that "hold," a customer could always time out of the booking process—at which point AA would release the seat back to the general pool.

the 15-minute "hold."[16]

At the same time, with tens of thousands of potential customers waiting to get to the front of the line, AA needed a timer that would help it retain potential customers who might otherwise have grown tired of waiting. The 15-minute "hold" provides this necessary cutoff. Indeed, the time limitation is necessary to AA's business for another reason: Without it, a consumer who was not sure whether she would need a particular flight could, months before that flight, fill out AA's online order form to near-completion and then leave the web browser open for weeks (or even months) at a time—until she was ready to pull the proverbial trigger and click "Pay Now." And, if (as Schultz insists) airlines were contractually bound by any such consumer who clicked "Pay Now"—no matter how long that consumer had waited before doing so—the airlines would be, in effect, prohibited from selling these indefinitely "held" tickets to anyone else—until, of course, just before the flight, when the prevaricating consumer would have made her decision. This cannot be the law.

Instead, the 15-minute "hold" is AA's way of policing this potential abuse by maintaining the customer's "place" in line—*but only* so long as that customer reaches the "Finish" page within the 15-minute window. If the customer does not, then her session will be timed out, her seat released to the general pool, and, when she attempts to complete her transaction, she will be met with a "cannot process" advisory not altogether different from the one Schultz encountered here. *See* Yienger Decl. ¶ 6 (noting that, if the 15-minute window had expired, Schultz would have been "notified that [her] session has timed out" and instructed to begin a new search).

---

[16] Notably, Schultz does not suggest that there is anything improper in AA's decision to implement this hold—nor does she argue that 15 minutes is somehow too short a window, that it places undue pressure on the purchaser, or that it is otherwise unconscionable or unfair.

Which is all in the way of saying that the most important thing about the 15-minute "hold" is that *it exists*—and that online consumers understand that it exists—because, if the "hold" is to have any efficacy at all, AA must, at a minimum, retain the ability to continuously cross-check the customer's online progress against that timeframe. As the Court has explained, Schultz never entered into a valid contract with AA because she never even made it to the end of the contractual process—never, in short, reached the "Finish" page, had AA verify her funds, or allowed AA to confirm her flight status with the authorities. But the point is that, even if she had done all that, she nevertheless would not have entered into a valid contract with AA if she had done so only *after* the 15-minute window had expired. In that circumstance, AA still would have had to perform that final check—confirm that Schultz had completed the booking forms *within the timeframe*—before a contract could be formed. In other words, even after a customer clicks "Pay Now"—but before that customer reaches the "Finish" page—AA must still ensure that the selected seat remains available and that its price has not changed.

To summarize, then, AA's advertised fare was, for four reasons, not an offer.

*First*, Schultz never actually completed AA's online booking process. Specifically, she never reached the "Finish" page—and, as a result, AA never verified her funds, charged her account, or confirmed her flight status with the regulatory authorities *See* MSJ at 10; Yienger Decl. [ECF No. 91-4 ¶ 4].

*Second*, AA's website warned Schultz that, in order for a passenger to have a valid contract, AA must first issue that passenger a ticket. *See* [ECF No. 59-9]. And Schultz concedes that AA issued her no ticket here.

*Third*, a customer's decision to click "Pay Now" necessarily leaves open several *indefinite* terms: namely, whether the online order forms were completed within AA's specified timeframe

and, if not, whether the selected seat remains available—and, if so, at what price.[17] Note that, in this respect, the length of the timeframe does not so much matter. It may be 15 minutes, 15 hours, or 15 days. What matters is that its presence—specifically, whether the customer has finished the booking process within the timeframe—represents an *indefinite* and *implicit* factor that, even as the customer clicks "Pay Now," prevents the advertised fare from being entirely "clear, definite, and explicit[.]" *Kolodziej*, 774 F.3d at 743 n.11.

*Fourth*, whether under a standard of "objective reasonableness," *see Mesaros*, 845 F.2d at 1580, or from the perspective of someone, like Schultz, who has purchased hundreds of tickets "from American" and "thousands of airplane tickets" overall, *see* Chart Summary ¶ 21, Schultz's view that, by clicking "Pay Now," she was binding AA to the advertised fare—irrespective of how long she had waited—is unreasonable as a matter of law.[18]

## C. The Theory of the Unilateral Mistake

Schultz's final argument is that AA's "inability to eliminate the possibility of error in its computer code" (or "some other error") somehow—she does not explain how—resulted in her

---

[17] Again, if the customer fails to click "Pay Now" within the specified timeframe, the seat may be sold to someone else. And, given that AA's algorithm is constantly adjusting prices based (in part) on alterations in supply and demand, if the selected seat is sold, the price of any remaining seats may be higher. *See* Chart Summary ¶¶ 9-10.

[18] Schultz's reliance on *Nguyen v. Barnes & Noble, Inc.*, No. SACV12812JLSRNBX, 2015 WL 12766130 (C.D. Cal. June 16, 2015), is misplaced. *See* MSJ Response at 13 (citing *Nguyen* for the proposition that, when an online vendor offers a specific product to a consumer at a specific price, the offer's terms are sufficiently clear and definite as to render the offer susceptible of acceptance). Unlike Schultz, the *Nguyen* Plaintiff actually made it to the end of Barnes & Noble's online ordering process. In fact, he submitted his relevant payment information, received an e-mail confirmation with an "Order Number," and then allowed Barnes & Noble to place a "hold" on his credit card for the amount of the purchase. It was not until 15 hours after his purchase that Barnes & Noble notified him that his order had been inexplicably canceled. Schultz, of course, never made it to the end of AA's online process, was never charged, and was immediately notified that her transaction could not be processed. Most importantly, unlike the *Nguyen* Plaintiff—who was never advised that the tablet he sought was subject to a limited inventory—Schultz, by her own admission, knew that "limited inventory is inherent in airline travel." MSJ Response at 7.

being offered a V class fare that no longer existed on May 25, 2017 at 7:00 p.m. EST. MSJ Response at 3, 5; *see also* Chart Summary ¶ 70 (AA uses proprietary software to timely remove unavailable fares from its inventory in order to prevent "errors of the type that would cause what the Plaintiff describes in this lawsuit"). Of course, as the Court noted in its "Analysis," Section II.A., *supra*, Schultz has no evidence for this proposition—and a plaintiff's untethered speculation is insufficient to survive a properly supported motion for summary judgment. But, even if she were right—even if some glitch in AA's system had caused it to offer her an otherwise-unavailable fare—the Court could not hold AA accountable for a contract into which, by Schultz's own telling, it entered only by mistake.

Under the doctrine of unilateral mistake, this Court must set aside an otherwise-valid contract if: "(1) the mistake was not the result of an inexcusable lack of due care; (2) denial of release from the contract would be inequitable; and (3) the other party to the contract has not so changed its position in reliance on the contract that rescission would be unconscionable." *Deprince v. Starboard Cruise Servs.*, 271 So. 3d 11, 20 (Fla. 3d DCA 2018). Even were the Court to credit Schultz's malfunction theory, AA would have easily satisfied each of these three conditions.

*First*, there is no evidence to suggest that AA's operation of a robust online ticketing system that properly services millions of passengers every single year somehow constitutes an inexcusable lack of due care. To the contrary, in its efforts to prevent "errors of the type that would cause what the Plaintiff describes in this lawsuit," AA (1) employs a proprietary software technology that timely removes unavailable fares from its inventory, *see* Chart Summary ¶ 70, and (2) deploys a complex algorithm that, by constantly analyzing an admixture of quantitative factors, sets and adjusts ticket pricing for every available fare class, *see* MSJ at 4. That does not sound like inexcusable neglect.

*Second*, given that, even under Schultz's account, AA never intended to offer her a V class fare, the "denial of" AA's request for relief from that mistaken contract would be, almost by definition, inequitable.

*Third*, neither Schultz nor AA changed their positions in any meaningful way as a result of the alleged "contract." To the contrary, Schultz went on to purchase a ticket for *that very same flight* at the then-prevailing rate: $379. There can be nothing "unconscionable" about holding the parties to a subsequent agreement into which they voluntarily entered.

In sum, even had the parties entered into an enforceable contract—which they did not—the Court would have set that contract aside because of AA's unilateral mistake.

\*          \*          \*          \*          \*

Accordingly, the Court hereby

**ORDERS AND ADJUDGES** as follows:

1. AA's Motion for Summary Judgment [ECF No. 91] is **GRANTED**.

2. All other pending motions are **DENIED as moot**, all other deadlines are **TERMINATED**, and any remaining hearings are **CANCELLED**.

3. The Clerk of Court shall **CLOSE** this case.

4. Pursuant to FED. R. CIV. P. 58, the Court will enter final judgment separately.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 2nd day of January 2020.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record